Filed 2/28/22

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO


| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL J. PHILLIPS,<br><br>   Defendant and Appellant. | A156387<br><br>(San Francisco County<br>Super. Ct. No. SCN228962) |


Defendant Michael J. Phillips appeals from his conviction after a jury found him guilty of special circumstances murder, aggravated mayhem, robbery, burglary and several other offenses. He argues the trial court erred by admitting evidence of prior misconduct, allowing an officer to opine that a dark substance observed on Phillips's cargo pants was blood, sustaining the prosecutor's objection to a part of defense counsel's closing argument and denying a motion for mistrial after witnesses testified to an inadmissible hearsay statement. We reject Phillips's claims of error as either unmeritorious or harmless and therefore affirm.

## BACKGROUND

James Sheahan, a 75-year-old man suffering from late-stage lung cancer, was found dead in his apartment on Bush Street in San Francisco on the morning of Monday August 14, 2017. A brother from out-of-state had

called Sheahan's apartment manager after he was unable to reach Sheahan. After the manager knocked on Sheahan's door and received no response, she called police, who entered the apartment.

Inside, police found Sheahan lying face down on the floor with large pools of blood near his head and feet. He had cuts on his wrist and dried blood in his hair, and there was blood and blood spatter on furniture, walls, a cordless telephone receiver and other items in his combination living room/bedroom. The police summoned paramedics, who arrived and confirmed that Sheahan was dead. An autopsy indicated that the death was a homicide, that Sheahan had suffered 12–13 blunt force injuries to the head as well as cuts to his wrists, that the cause of death was multiple traumatic injuries and that he had died sometime between the evening of Friday August 11, 2017, and the morning of Monday August 14, 2017.

A post-it note found in Sheahan's apartment bearing the name "Mike" and a phone number led Sergeant Discenza, the lead officer investigating the crime, to call Phillips on Thursday August 17, 2017, and to record the conversation when Phillips returned the call the same day. In response to Discenza's questions, Phillips told the officer he first learned of Sheahan's death from Discenza's voicemail message, he had last visited with Sheahan the previous Friday evening, the visit had been brief, he and Sheahan had been close friends, he knew Sheahan had lung cancer and he was trying to arrange cheaper home care for Sheahan than he was currently getting. Ultimately, the investigation, which will be described in the discussion of the trial below, pointed to Phillips as the murderer.

# I.

## *The Charges*

In April 2018, the San Francisco District Attorney charged Phillips with murder (Pen. Code, § 187, subd. (a)(1)[1]) with three special circumstance allegations (financial gain (§ 190.2, subd. (a)(1)), robbery (§ 190.2, subd. (a)(17)(A)) and burglary (§ 190.2, subd. (a)(17)(G)) [Count 1]; aggravated mayhem (§ 205) [Count 2]; inflicting injury on an elder or dependent adult (§ 368, subd. (b)(1)) likely to cause great bodily injury (§ 368, subd. (b)(2)) [Count 3]; first degree robbery (§ 211) with great bodily injury (§ 12022.7, subd. (c)) [Count 4]; first degree residential burglary (§ 459) with great bodily injury (§ 12022.7, subd. (c)) and in the presence of another person, a violent felony (§ 667.5, subd. (c)(21)) [Count 5]; first degree residential burglary (§ 459) in the presence of another person [Count 6]; theft, embezzlement, forgery or fraud on an elder (§ 368, subd. (d)) in an amount exceeding $950 [Count 7]; manufacture, possession or utterance of fraudulent financial documents (§ 476) [Count 8]; misdemeanor theft of an access card (§ 484e, subd. (c)) [Count 9]; and receiving stolen property (§ 496, subd. (a)) [Count 10].

# II.

## *The Trial*

Phillips's trial commenced in August 2018 and concluded with a verdict convicting him of first degree murder with special circumstances, mayhem, abuse of an elder with great bodily injury, first degree robbery and burglary, both with great bodily injury enhancements, fraud on an elder, possession of fraudulent financial documents and theft of an access card.

---

[1] Statutory references are to the Penal Code unless otherwise indicated.

## A. Prosecution Evidence

James Sheahan, a 75-year-old man suffering from stage 4 lung cancer, was hospitalized in June and July 2017 to be treated for a severe diarrhea condition caused by the chemotherapy he had been receiving. His condition improved, and he returned home in July 2017.

Sheahan's nurse from Sutter Health, Angelica Tumandao, testified that she first saw him at his apartment on July 14, 2017. He was weak and pale and his brother Tom was with him. She was concerned that he might fall and thought he should be placed in a facility where he could be cared for. She saw him at his apartment on Friday August 11, 2017. He was walking, was not bedridden, had a caregiver he was happy with, and was not injured or coughing up blood. She was no longer concerned that he needed to be moved into a facility. He was smiling, happy with his caregiver and receptive to what the nurse was teaching him.

On Monday August 14, 2017, a temporary manager of the building where Sheahan lived, Vickie Chak, received a call from Sheahan's brother Tom asking her to check on Sheahan because Tom had been trying unsuccessfully to reach him. At about 9:30 or 9:45 that morning, she knocked on the door to Sheahan's apartment and called his name and when nobody answered called the police.

San Francisco Police Officers Scott Dumont and Kimberly Larkey arrived at Sheahan's apartment at about 10:30 a.m. Receiving no response when they knocked on Sheahan's door, they were assisted by Chak who used a master key to open the door. They found Sheahan's body lying face down on the living room floor. He had blood on his head and in his hair and an injury on his wrist and dried blood toward the base of his feet. There was dried blood on him and throughout the apartment. He was not showing any life symptoms and appeared to be dead. The blood in his hair, at his feet and

4

throughout the apartment was dry.  There was an odor of body decomposition.  Sheahan's wrists were slit but the officers looked and did not immediately find a knife.

There was a large pool of blood on the floor close to Sheahan's head and another on the floor near his feet.  There was also blood on the couch, bookcases, books, walls, telephones, a fan, box, pillows, a bed, magazines and papers.  Near Sheahan's feet were a towel and a tissue box, both of which were bloody.  Inside the box were a pair of bloody yellow rubber gloves, a pair of bloody clear latex gloves and what appeared to be wadded up bloody tissue.

Two apartment windows were open, one in the living room facing Bush Street and one in the kitchen facing an interior courtyard.  The kitchen window led to a fire escape that descended toward the courtyard.

After paramedics arrived, examined the body, pronounced Sheahan dead and left the scene, two investigators from the Medical Examiner's Office arrived.  Officer Larkey told them there was no sign of forced entry, a key was used to open the locked door, the death did not appear to be from natural causes and could have been self-inflicted or from an assault, and there was possibly a knife missing from the butcher block in the kitchen.  She also noted that some picture frames appeared to be knocked off the wall and there was blood spatter on the wall there.  After searching for an object that could have inflicted the injuries, the investigators bagged Sheahan's body and removed it.

Assistant Medical Examiner Ellen Moffat, who performed an autopsy on Sheahan's body, testified as an expert in forensic pathology.  She had examined the body, the toxicology report, and slides containing tissue samples and conferred with other assistant medical examiners.  Dr. Moffat determined the manner of death was homicide.  She did not believe the cuts

to the wrists caused Sheahan's death (though they could have contributed to it) because there was very little bleeding, as there would have been if a person had cut his own wrists while he was alive and his heart was beating. The cause of death, she opined, was multiple traumatic injuries caused by someone else: specifically, 12 to 13 head injuries caused by an object or objects, not heavy enough to fracture the skull, with smooth edges and curves. The black phone found at the scene had curves and edges consistent with the injuries and could have caused them. There was bleeding inside the skull while Sheahan was alive, but not enough to have caused death by itself. The stress of being attacked and hit in the head multiple times and the blood loss from the head and wrist injuries, combined with Sheahan's emphysema and heart disease or bad heart rhythm, may have caused his heart to stop.

Dr. Moffat placed Sheahan's cause of death a day or two before the morning of Monday August 14, 2017, when his body was found. The condition of the body was consistent with being struck on the head on the morning of Saturday August 12, 2017, and dying sometime later. It was less likely that he died on the morning of Monday August 14, 2017, because the lividity was fixed, the body had no rigor and it had skin slippage.

A forensic toxicologist testified that blood and urine samples from Sheahan's body contained no alcohol or nicotine. Morphine, Valium, an antidepressant, caffeine and drugs for sleep and nausea were found, all within the normal therapeutic range.

San Francisco Police Department Criminalist, Amy Lee, testified about DNA evidence. Phillips's DNA was not found in or on the bloody rubber and latex gloves found at the scene.[2] Nor was it found on other objects found at

---

[2] Only Sheahan's DNA was positively identified on the latex gloves. The yellow rubber gloves contained Sheahan's DNA, Phillips was excluded as

6

the scene, such as lighters, a flashlight and a knife handle, which had Sheahan's DNA on them.[3]  Blood stains on the inside of the black and red Trader Joe's bag found in Phillips's car tested positive for Sheahan's DNA. There was no DNA of Sheahan's found elsewhere in Phillips's car or on other items found in the car.  Dark gloves found in Phillips's home and car contained only his blood and non-blood DNA and no DNA of Sheahan's.  Two of the three pairs of cargo pants seized from Phillips's residence tested negative for blood and were not tested for DNA.

Sergeant Lyn O'Connor was qualified as an expert in crime scene investigations and bloodstain pattern analysis.  She testified with the use of video and photographs showing the uncontaminated crime scene to supplement her observations.  In her opinion, all the blood in Sheahan's apartment was from a singular event.  The bloodstains on the bookshelf, fan, wall, a basket and papers were from blood that was both impact and cast off from multiple injuries to the back of Sheahan's head.  The black phone handset could have caused the blood spatter from the blunt force trauma injuries to Sheahan's head.  Sheahan could have been struck while upright and received additional blows to the head while he was face down with his head turned to the side.  The body had been moved after the head injuries were inflicted, and blood from the head had pooled as the bleeding continued. Pooled blood came from the head (not the wrist) injuries, and the bleeding may have occurred over a long time.

The assailant likely had at least some blood spatter on his or her clothing.  If someone stepped in or knelt on the pooled blood, that person

---

a major contributor and there were DNA alleles of a third person indicating that person had worn the gloves at some point in time.

[3]  Non-blood DNA of an unidentified person was found on one of the lighters.

could have gotten a transfer stain on his or her clothing. A video recording showing Phillips with a stain on his left pant leg was consistent with blood transfer staining. The lack of blood spatter visible on Phillips's clothing did not cause O'Connor to doubt that he could have been the person who inflicted the injuries on Sheahan.

A computer expert determined that Sheahan's computer was used on August 11, 2017, and was last used on August 12, 2017, at 4:46 a.m.

Sheahan's caregiver, Mary Adina, testified that she began working with him for four hours each day from Monday through Friday after he got out of the hospital. She last saw him on a Friday and was told the following Monday that he had passed away. That Friday, he used his computer and gave her his mailbox key to retrieve his mail. Adina returned the mailbox key to him when she brought him his mail. Sheahan told Adina he was happy that day because a friend or friends were coming over on the weekend to take him out for a walk. That day, Adina cleaned Sheahan's kitchen, made the bed, organized his refrigerator and mopped the floors and left his apartment at 4:00 p.m. Sheahan was alive and well when she left and was not injured, although he had trouble breathing. There was no blood on the carpets, broken knife in the kitchen, and the kitchen window was not open. Adina had never used or seen yellow rubber gloves or white latex gloves in Sheahan's apartment. Nor did she ever see a flashlight, white hair pick, detached knife blade or handle or cigarettes or lighters there. She had never seen Sheahan smoke and she never smoked in his apartment. Neither she nor Sheahan ever opened his kitchen windows.

Sheahan had told Adina earlier in August that he was not going to lend money to a friend who wanted to borrow money to send to the Philippines.

8

A neighbor who lived in the apartment next door to Sheahan's testified that she was in that apartment over the weekend from Friday August 11, 2017, to Monday August 14, 2017. At some point in the week or on the weekend that Sheahan died, she noticed that Sheahan's front window was open. Over the five months she had been living next door to him, she had never previously seen Sheahan's window open.

Sheahan's nurse Tumandao testified that she visited Sheahan's apartment once or twice a week to administer Morphine and Ativan and to teach him symptom control. She never used yellow rubber gloves, white latex gloves or towels at Sheahan's apartment. Nor did she remember seeing a white hair pick, detached knife blade or handle or lighter there. She last saw Sheahan on Friday August 11, 2017, at around 4:00 or 5:00 p.m.

Sheahan's friend Jacqueline Buckley testified that she had known him since 1992, when they worked for the same city agency, and after he retired in 2005 saw each other monthly for lunch and a movie or museum visit. They were "[p]retty close." Sheahan did not have a car, so Buckley drove him to medical appointments, including for surgeries and, after he was diagnosed with lung cancer in June 2017, for chemo treatment.

Buckley had met Sheahan's brother, Tom,[4] and his wife, Sherry, twice when they visited from Minneapolis several years earlier. After Tom told her Sheahan had suffered a bad reaction to chemotherapy and was in the hospital, she visited him there and visited him weekly after he returned to his apartment in July. She last saw Sheahan at his apartment on August 10, 2017. He seemed to be okay, meaning he was able to get up and walk around and was in good spirits. The following Monday, Tom phoned and told her

_____

[4] We refer to Tom Sheahan by his first name for clarity and mean no disrespect.

9

Sheahan had passed away over the weekend. Tom and Sherry came to San Francisco for the funeral.

When Sheahan was in the hospital, he told Buckley he had a friend named Mike and that Mike knew someone in the Philippines who could come and be a caregiver for Sheahan after he went home. Mike wanted thousands of dollars from Sheahan to bring that person from the Philippines to San Francisco. Buckley advised against it, and Sheahan later told her he had decided not to give Mike the money. Buckley heard Mike tell Sheahan on speakerphone that he had found someone to give him the money and would bring the person over from the Philippines so they could have a wedding in October.

On Thursday, August 17, 2017, Sergeant Domenico Discenza, a homicide investigator assigned to lead the Sheahan investigation, called and left a message for Phillips, whose first name and phone number he had found on a sticky note in Sheahan's apartment attached to a resume for a caretaker from the Philippines named Archie Fuscablo. Phillips returned the call early that evening. The call was recorded. Phillips said he first learned about Sheahan's death from Discenza's message. He told Discenza he had last visited Sheahan on Friday August 11, 2017, after work at about 7:00 or 8:00 p.m. Phillips said he had a new job as a FedEx driver and did not stay real long. He usually stayed from 30 to 45 minutes. Phillips said that when he visited Sheahan, he would buzz Sheahan from the front door to the building and Sheahan would open it. Sheahan could not go out by himself, and he and Sheahan had talked about him coming over to take Sheahan outside using the elevator.

Discenza later obtained video footage from several security cameras placed around the apartment building in which Sheahan had lived for the

period from Friday August 11, 2017, at about 1:00 p.m., to Monday August 14, 2017, at about 10:00 a.m.  The recordings showed that, contrary to what he had told Discenza, Phillips did not visit Sheahan on Friday August 11, 2017.  During that three-day period, the video first showed Sheahan arriving at the apartment building on Saturday August 12, 2017, at about 10:21 a.m.  The video showed him arriving at the front door, going to the call box, waiting for about 25 seconds, appearing to have been buzzed in and entering the lobby of the apartment building.  He was wearing dark cotton gloves, light colored cargo pants, a red sweatshirt with a hood and a Jurassic Park t-shirt, and he was carrying a black and red Trader Joe's bag.  At 11:47 a.m. the same day, Phillips walked down the stairs in the building holding the same bag.  There was a stain on his left pants leg that had not been there when he arrived.

Phillips reentered the building at 12:05 p.m. still carrying the red and black bag.  This time and all subsequent times, he let himself in with a key.  He left the building again at about 12:20 p.m. with the red and black Trader Joe's bag and a second, multicolored Trader Joe's bag.  He reentered around 12:42 p.m. carrying both bags and left about four hours later, at 4:44 p.m. with both bags.  There was now a second stain on his left pant leg, just above the left knee.

Both stains remained on Phillips's pants as he reentered the building at around 5:20 p.m., left at 7:58 p.m., reentered again at 8:01 p.m. and left for the day at 8:52 p.m.  When he left the final time, he had both Trader Joe's bags and also a banker's box without a lid.  In some, but not all, of his exits and reentries that Saturday, Phillips was wearing dark colored gloves like the ones he first entered with that morning.

11

Discenza opined that the first stain seen on Phillips's pants was consistent with blood, and that it was a blood stain. O'Connor, the expert on bloodstain spatter analysis, testified she did not know what the stains seen on Phillips's pants in the videos were, but that they were consistent with blood or any other dark liquid. A person who knelt in blood could transfer blood onto his clothing.

Discenza obtained footage for Saturday August 12, 2017, from a surveillance video camera at a Wells Fargo Bank branch about seven or eight blocks away from Sheahan's apartment. This footage was shown to the jury while Discenza was testifying. It showed Phillips going to two different ATM machines between 12:04 p.m. and 12:06 p.m. and attempting to use a PIN number at one of them.

The apartment building security video footage showed that Phillips returned to the building at 9:31 a.m. on Sunday August 13, 2017, carrying the multicolored Trader Joe's bag and entering with a key. The video from that day showed Phillips open a mailbox using a key, take mail out of the box and go upstairs with the mail. At 10:00 a.m., he left again carrying the multicolored Trader Joe's bag, a white banker's box containing three rolls of paper towels, and a framed picture. He was not wearing gloves. He left the building and did not return.

Police never found the key to Sheahan's apartment building or the key to his apartment door. Nor did they find the red-hooded sweatshirt or Jurassic Park t-shirt Phillips was wearing on August 12, 2017. At his residence, they did find three pairs of light-colored cargo pants, one of which had bleaching on it and numerous pairs of black and brown knit gloves. They also found the framed print Phillips had carried out of Sheahan's apartment on Sunday August 13, 2017.

In the trunk of Phillips's car, they found more pairs of brown or black cotton gloves like those he had been wearing in the video and two Trader Joe's bags that looked like those he had carried into and out of Sheahan's apartment on Saturday August 12, 2017.  The red and black Trader Joe's bag had blood stains inside that were later determined to be Sheahan's blood.  The age of the bloodstains could not be determined.  A bloodstain expert opined that the stains inside the bag could have been transferred from a bloody object that was placed inside it.  There was no way to determine when the blood had been transferred to the bag.

Discenza did not find Sheahan's current wallet, Wells Fargo credit card or checkbook at the crime scene.  He found new pads of checks inside a box at Sheahan's apartment one of which had checks removed.  Discenza learned from Wells Fargo Bank that one of Sheahan's Wells Fargo cards had been used at an ATM for two attempted transactions at about 12:04 p.m. on August 12, 2017, and that two of his checks had been cashed, one on August 14 and another on August 30, 2017.  Video footage he obtained from the bank showed Phillips at two of its ATMs on August 12, 2017, from 12:04 p.m. to 12:06 p.m., wearing the same clothes he had been wearing in the apartment building video from the same date.

At Phillips's home, Discenza found some of Sheahan's checks.  He found one, payable to Phillips and ostensibly signed by Sheahan, pinned to a bulletin board in Phillips's home office.  He also found loan documents, records of people to whom Phillips owed money, references to "Archie Fuscablo" and a framed marriage certificate for Phillips and Fuscablo dated October 30, 2017.  At one of Phillips's storage units, Discenza found a cardboard box containing Sheahan's wallet, driver's license, credit cards, membership cards and a mailbox key.

13

Sheahan's checking account records showed that on or before Monday August 14, 2017,[5] Phillips cashed Sheahan's check number 640, in the amount of $7,500 purportedly written by Sheahan to Phillips on August 1, 2017. They further showed that on or before August 30, 2017, Phillips attempted to cash Sheahan's check number 648, which he had purportedly written to Phillips for $3,500 on August 30, 2017, but the check was declined for insufficient funds. On or before September 1, 2017, he tried to cash check number 649 for $4,000, but that check was also declined because there were insufficient funds in Sheahan's account.[6]

A forensic document examiner, Miriam Angel, compared handwriting exemplars from Sheahan's records and Phillips's records and examined the checks purportedly written by Sheahan to Phillips in August and September 2017. The check found on Phillips's bulletin board, check No. 653, was definitely a simulation rather than something Sheahan actually wrote, she opined, because three different pens were used to write it, it did not have fluency in the amount of pressure applied during writing, there were breaks where there should not have been, connecting strokes and proportional heights were different from the Sheahan exemplars, and a printed "A" rather than a cursive one was used for "August." Some of the differences between the original check and the exemplar also applied to the three copied checks, which she opined probably were not written by Sheahan either.

Sheahan's sister-in-law, Sherry Sheahan (Sherry), testified that she and her husband (Sheahan's brother, Tom), travelled from Minneapolis to

_____

[5] The dates we refer to are the dates the funds were deposited in Phillips's accounts, not necessarily the dates he presented them.

[6] Smaller checks from Sheahan to Phillips in July 2016 and July 2017, including three for $50 each and one for $650 with the notation "housing in San Diego," lacked any indicia of fraud.

14

San Francisco in July 2017 to see Sheahan, while he was in the hospital being treated for side effects from chemotherapy. Tom arranged for home health care for Sheahan and resolved financial and estate issues. Tom and Sheahan had discussed Sheahan lending money to Phillips. Sheahan was feeling better and thought he would have some more months to live. Sheahan's will left half his estate to Tom and half to their other brother and did not leave anything to Phillips. When Sherry and Tom went to San Francisco again for Sheahan's funeral, they dealt with Sheahan's affairs and did not give Phillips permission to take any of Sheahan's possessions or his money or to cash his checks. Phillips did not attend Sheahan's funeral.

A journal belonging to Sheahan was found at his apartment. Handwritten entries from it were admitted in evidence. They indicated Sheahan had at times been skeptical of Phillips's friendship. He wrote about having been invited by Phillip to spend time with him in San Diego in July 2016, only to be left mostly to himself for the week he spent there. Phillips failed to pick him up at the airport and, when they met for dinner the night Sheahan arrived, informed Sheahan that he owed Phillips $650 for his share of the rental of a large Victorian where the two were staying. At the end of that week, Sheahan wrote that he was "feeling . . . mostly victimized by [Phillips]," and wondered if Phillips had invited him to San Diego "just to chip in for the rent on that fancy Victorian." He wrote, "I think I was used—exploited—and mostly abandoned. And I vow never to let this happen again." On October 28 of that year, Sheahan wrote "about a certain person I've considered a friend—Mike Fillips [sic]—who I haven't heard from since that disappointing trip to San Diego."

In a March 20, 2017 entry, Sheahan wrote, "Surprisingly, Mike Filips [sic] called for no particular reason, but he talked about his Filipino boyfriend

coming to America soon as his visa is in order." He worried that Phillips was "being taken for a sucker." On April 23, 2017, he wrote that Phillips had called "to check on my health and—perhaps more so—to see if I was willing to come over to his place to monitor his sidewalk sale. I said I wasn't up to it. Mike is anxiously awaiting his friend's arrival in S.F. to take up residence here and partner with him. It looks like a shaky relationship—a big gamble for Mike, who is not well fixed financially to take on a new relationship. I wonder if his recent friendliness toward me is a prelude to hitting me up for aid."

On April 29, 2017, he wrote about a call he received from Phillips "thinking he was sincere about my health & offering to give me a ride home from doctors' appointments; however, when the conversation turned to his Philipino [*sic*] friend I wondered if I was being duped into a loan. Supposedly Fredey [*sic*] was injured at the carwash in the Philipines [*sic*]. His finger got slammed in a door & required hospitalization, but the government health insurance wouldn't pay for his bills and that could lead to imprisonment under the Philipino law. In short, Freddy needs $1400 to cover his bills & Mike doesn't have it & can't get it from anyone or anywhere. At that point, I felt a bite being put on me. I explained that I was facing uncertain times & couldn't put out any money. Mike said he understood, but I don't believe his story, and I don't give loans to anyone. Still, the idea of my being solicited for money leaves me uneasy. [¶] I have the rest of this weekend to think about my situation."

Discenza obtained MoneyGram and Western Union reports revealing that Phillips transferred about $62,000 to the Philippines between July 19, 2016, and October 1, 2017. Of that, $55,390 was sent to Archie Fuscablo and $3,650 to a Michael Francia Escara in Manila. Discenza

16

obtained financial records reflecting transactions between Phillips and Fuscablo made through a PayPal subsidiary (Xoom), Western Union and MoneyGram.

Telephone records showed that on August 12, 2017, Phillips made a 48-second call to Sheahan's land line at 10:03 a.m. and there also was an 11-second call to Sheahan's land line at 10:28 a.m. from the callbox in front of his building, and that there were no further calls from Phillips's cell phone to Sheahan's land line after that date.

On November 22, 2017, Discenza arrested Phillips and took his DNA sample and cell phone. He recorded an interview of Phillips on the same day. Phillips's hair was gray, rather than the brown color it had been on the video of him at Sheahan's apartment. Asked about the checks he had cashed and attempted to cash on Sheahan's account after his death, Phillips told Discenza that Sheahan was dying and had given him money because he knew Phillips needed financial help. He explained that Sheahan had given him three checks with different dates and would move money from one account to another over the next few months so that Phillips could cash them. He first said Sheahan had given him several hundred dollars on each check with the intent that Phillips would receive a total of $20,000 by the time he died. He then said the checks might have been for thousands, rather than hundreds, to total $20,000. Sheahan post-dated the checks because he did not have enough money in his account to give the funds to Phillips all at once. Phillips did not ask Sheahan for the money; Sheahan volunteered. After Phillips got a call saying Sheahan had died, he cashed the checks he hadn't already cashed. The last one bounced. Phillips denied having written any of the checks himself. Phillips also said Sheahan gave him a picture that he liked,

17

which he then sold for $30 or $40 at an "estate sale" he was doing out of his home.[7]

Phillips also told Discenza that his husband was coming over from the Philippines and was going to be a caregiver for Sheahan, and that Sheahan had liked the idea. Phillips said he had talked with Sheahan about taking Sheahan out for a walk but he never did it because Sheahan was too weak, and that Sheahan didn't give him keys to Sheahan's apartment but might have let him use Sheahan's spare keys. Phillips denied having Sheahan's ATM card.

Shown a photograph of himself entering Sheahan's apartment building, he agreed the photo was of himself and acknowledged that he used to color his hair. The gloves he was wearing in the photo were ones he wore at work and everywhere. He did not remember being at Sheahan's apartment on a Saturday for hours or going to the Wells Fargo ATM that day, but it might have happened and Sheahan sometimes sent him to the ATM to get cash for the caregiver. Phillips did not remember having a whole weekend off or being at Sheahan's apartment on a Sunday. But he might have been there if Sheahan had called him. He thought he was changing light bulbs, wiping up, cleaning out Sheahan's refrigerator. Sheahan was embarrassed that his apartment was so dirty and asked Phillips to clean it. Phillips also explained the stain on his pants probably was from food resulting from cleaning Sheahan's refrigerator. It was not blood, because Phillips had not cut himself. When Phillips left Sheahan's apartment, Sheahan was alive and had no injuries. Discenza pointed out that when he had spoken on the phone with Phillips shortly after Sheahan's death, Phillips had not remembered spending the whole weekend with Sheahan, cleaning out his apartment, or

---

[7] The picture was found in Phillips's apartment building.

18

going to the ATM but had remembered only being there for about 20 minutes on a Friday.  Phillips told Discenza his fiancé's life was in danger in the Philippines and they needed money to bring him to the United States.  This was why his Facebook page had a June 15, 2017 post stating he was "in desperate need of personal loans to save a life."

Discenza discovered Facebook messenger communication between Phillips and Archie Fuscablo.  On Friday August 11, 2017, Phillips sent a text to Fuscablo that said, "my old schedule at TJ's had me off on wed and thur but now i am off on Sat and Sun[.]"  Later that day, Phillips wrote, "When i wake up in morning i will start on process of sending soem [sic] money while you sleep . . . ."  On Saturday August 12, 2017, at 8:36 p.m., Fuscablo wrote Phillips, "how was payment money, my live [sic]?"  Phillips responded at 9:18. p.m., "I fought hard all day and got money gram money to send you."  Discenza also found a Go Fund Me social media account Phillips created around September 25, 2017, seeking money for Fuscablo.

While searching Phillips's home, Discenza found a box under Phillips's bed containing a vehicle registration card in the name of a Gene Levy and medication with Levy's name on it.  He learned that Levy had lived in an apartment on Sacramento Street during the time Phillips worked there as an assistant resident manager.  Levy had died of cancer and there had been a police report in May 2014 of a burglary at Levy's apartment.

The officer who investigated that burglary in May 2014, Sergeant Jim Serna, testified.  Levy had died in April 2014.  The reporting party, Lois Clark, called from out of state and gave the report over the phone.  On May 24, 2014, Serna met with a person named Michael Phillips who was the property manager at the Sacramento Street apartment building where Levy had lived.  Serna identified Phillips at trial.  Serna asked to go into Levy's

apartment because he wanted to see if there were any signs of forced entry or foul play. Phillips took him to the apartment and let him and a fellow officer in with a key. Phillips had told Serna he thought the suspect gained entry through an open window in the apartment's bathroom that was next to a fire escape. He told them the window had been open. The officers found no evidence of forced entry or damage to the apartment door or to any window, and the fire escape could not be reached from the ground level. Phillips denied knowing what had been stolen. When Serna relayed to him what the reporting party had said, Phillips responded that Lois Clark would not know whether the window had been locked because it had been covered by a curtain and she couldn't have seen it.

Discenza searched a law enforcement database and determined that Phillips did not own any firearms but had sold two firearms to a Mountain View gun dealer, a 40-caliber Glock and a 9-mm. Beretta. The guns had belonged to Gene Levy. The dealer, Gary Kolander, testified that on March 1, 2017, he purchased two guns from Phillips for about $250 or $300 each, after Phillips said he owned them.

Discenza found in Phillips's bank records deposits of two checks, one for $3,000 and one for $4,500, from a Peter Schildhause. Schildhause testified that he purchased six paintings from Phillips on E-Bay in two lots, for $3,000 and $4,500. Phillips had told him an uncle died and left him the paintings. Phillips said he was selling the paintings to help a Filipino man with whom he was in love. Months later, Phillips asked to see the paintings and, when Schildhause got together with him, asked for money to help his boyfriend in the Philippines pay his bills. Schildhause loaned him $1,000, which Phillips had not repaid. Months later, police came and took the paintings.

In the November 2017 interview with Discenza, Phillips said he had been a manager at the building where Levy lived but had been fired for no reason. He had keys to all the apartments when he worked there. He met Levy's family, who told him not to take anything from Levy's apartment and who later reported that some of Levy's property, including the two guns Phillips had sold, had been stolen. Phillips admitted receiving and selling a gun or guns from a tenant who had been sick and died, but denied that he got guns from Levy. Phillips did not remember where he got guns and denied knowing they had been reported stolen. He said the paintings he sold to Schildhause were given to him by his former boss at the apartment building, Barbara Brooks. But he said Brooks did not give him anything from Levy's apartment, and he did not know the guns or paintings were reported stolen.

Brooks testified that she and her husband had owned the apartment building on Sacramento Street where Phillips lived and served as resident manager for several years. When tenants passed away, she never took any of their possessions or gave any of their possessions to Phillips.

### B. Defense Evidence

A defense private investigator, Keith McArthur, testified that when he stood on the fire escape located outside Sheahan's kitchen window, he could touch the hotel building next door. He testified that someone from a platform of the hotel could easily get to that fire escape. Prosecution police officer witnesses acknowledged that fact on cross-examination, admitted there were window screens lying on the platform of the hotel near the fire escape that had not been taken into evidence and admitted that the kitchen window opening was large enough for a person to fit through and a potential point of entry to Sheahan's apartment. The apartment manager for Sheahan's building testified on cross-examination that she saw a filled trash bag from Sheahan's apartment lying out of place in the middle of the courtyard to

21

which the fire escape led.  The cameras that showed the inner courtyard did not record Phillips ever appearing in or near it.

A woman who was housesitting in an apartment in Sheahan's building, Holly Howard, testified that on the night of Sunday August 13, 2017, or Monday August 14, 2017, she was awakened in the late night or early morning hours by the sound of yelling.  She described the yelling as sounding like people arguing after leaving a bar and said it could have come from outside or inside the building.

Video footage from a surveillance camera on Sheahan's apartment building showed a lit object floating down from the front of the apartment building to Bush Street at 2:29 a.m. on Monday August 14, 2017.

One of the medical examiners who came to the scene of Sheahan's apartment on Monday August 14, 2017, testified that Sheahan's body was not emitting odors and was slightly warm to the touch and that rigor mortis was breaking with slight pressure and livor mortis was blanching.  The other medical examiner testified similarly about no odors outside the door and testified that inside the apartment he smelled only the faint flatulence type odor that emanates from any dead body and did not smell the odor of decomposition.  A paramedic who responded to the scene testified that she did not smell anything outside Sheahan's apartment door and that once inside she did not recall smelling the powerful and distinctive odor of a deceased body.  Nor did she see any insects of the kind paramedics often see around dead bodies.

A police officer who had testified about use of Sheahan's computer, testified that on the early morning of August 12, 2017, the user was looking up on the Internet how to hang a picture on a wall.

22

Sutter Health medical records pertaining to Sheahan's hospitalization in June and July 2017 contained nurse and social worker notes indicating that Sheahan's friend Mike was in the hospital room when they were discussing assistance and support for Sheahan when he returned home and later when Sheahan was being released and that the nurse spoke with Mike about "discharge planning options in detail." The notes also indicated that Sheahan "said he was thinking of hiring a caregiver recommended by a friend, but that person 'still has to get a flight.'"

Entries in Sheahan's 2017 journals indicated Phillips had called to follow up on Sheahan's "offer to turn over most of my giant porn video collection" which Sheahan was "glad to get rid of" and "would not want my relatives or whoever to discover." An August 1, 2017 entry said it was "gratifying to have people come & visit me," that Phillips had come over that morning and that Phillips had "retrieved a package awaiting me." An entry on August 4, 2017, indicated Phillips had called and come over and, "while here, he fixed that kitchen light" and "also retrieved my mail, which contained another caretaker bill. Hope all that changes; but, Mike has turned out to be a very good friend. God bless him! Onward!" On August 9, 2017, Sheahan wrote that Phillips had "called to see how I was doing."

Telephone records showed Phillips and Sheahan had called each other 22 times between July 6 and August 5, 2017.

## III.

### *The Verdict and Post-Verdict Proceedings*

The jury heard testimony of 37 witnesses, saw and heard video and audio evidence along with telephone records, medical records, photographs and other evidence. The evidence was presented over 14 trial days, followed

by instructions and closing arguments over a day and a half. The jury deliberated for nine to ten hours over two days,[8] before reaching a verdict. The jury found Phillips guilty on nine counts, found true two special circumstances and found true four special allegations. Specifically, it found Phillips guilty of first degree murder with the special circumstances that the murder was committed during a robbery or attempted robbery and during a burglary or attempted burglary; it found him guilty of aggravated mayhem; it found him guilty of inflicting injury on an elder or dependent adult and found true the allegation that Sheahan suffered great bodily injury; it found Phillips guilty of first degree robbery and found true the special allegation that in committing the robbery he inflicted great bodily injury on a person 70 years old or older; it found him guilty of two counts of first degree burglary, and as to one of those, found true the allegations that he inflicted great bodily injury on a person 70 years old or older and committed the burglary when another person was present in a residence; finally, it found him guilty of theft, embezzlement, forgery or fraud on an elder and dependent adult, manufacture, possession or utterance of fraudulent documents, and theft of an access card. It failed to make a finding on a tenth count for receiving stolen property, and that count was dismissed.

Phillips moved for a new trial on several grounds, including some he has raised again on appeal. The trial court denied the motion. It sentenced Phillips to life without parole on the murder with special circumstances conviction and a consecutive determinate sentence of six years and eight months for the second burglary conviction and the fraudulent financial

---

[8] The deliberations began mid-afternoon on October 16, 2018, continued for a full day on October 17, 2018, followed by a half day on October 18.

24

documents convictions.  It stayed the sentences on the other counts under section 654.

## DISCUSSION

### I.

### *The Trial Court Did Not Err by Admitting the Levy Prior Uncharged Crimes Evidence.*

Phillips contends the trial court erred in admitting evidence of his burglary and theft of paintings and guns from Levy and his staging of Levy's apartment to look like there had been a burglary by leaving windows, including one leading to a fire escape, open in Levy's apartment.  He argues it was error to admit the evidence under Evidence Code section 1109 to show a propensity to commit elder abuse because Levy was not an "elder" within the meaning of that section.  He further contends the trial court erred in admitting the evidence under Evidence Code section 1101, subdivision (b), to show knowledge, intent and common plan or scheme.

The People contend the trial court did not admit the evidence under Evidence Code section 1109, but only admitted it under Evidence Code section 1101, subdivision (b) to show intent, common scheme or plan.  The court's reference to Evidence Code section 1109, in their view, "appears to have been a misstatement," given its earlier statement that it was admitting the Levy evidence only under Evidence Code section 1101, subdivision (b).  The People point out that the court instructed the jury this evidence could be used only to show intent, knowledge and common plan or scheme and not for any other purpose, precluding its consideration as showing a propensity to commit the crimes charged.  The People contend the trial court properly admitted the Levy evidence under Evidence Code section 1101, subdivision (b) to prove intent, knowledge and common plan or scheme.

25

## A. Evidence Code Provisions and Case Law

As a general rule, evidence of a person's character, including his prior conduct, is not admissible to prove his propensity to commit a crime with which he is charged. Evidence Code section 1101, subdivision (a), states, "Except as provided in this section and in [Evidence Code] Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

The general rule against using evidence of prior misconduct to show propensity does not preclude its use for other purposes. Evidence Code section, 1101, subdivision (b) states, "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

The Legislature has also created exceptions to Evidence Code section 1101, subdivision (a) for certain kinds of cases, allowing the use of prior misconduct to show propensity. One of those, Evidence Code section 1109, subdivision (a)(2), creates such an exception for "criminal action[s] in which the defendant is accused of an offense involving abuse of an elder or dependent person." With exceptions not relevant here, in a criminal action alleging elder or dependent abuse, "evidence of the defendant's commission of other abuse of an elder or dependent person is not made

26

inadmissible by Section 1101 if the evidence is not made inadmissible pursuant to Section 352." (Evid. Code, § 1109, subd. (a)(2).)

Evidence Code section 1109 defines " '[a]buse of an elder or dependent person' " as "physical or sexual abuse, neglect, financial abuse, abandonment, isolation, abduction, or other treatment that results in physical harm, pain, or mental suffering, the deprivation of care by a caregiver, or other deprivation by a custodian or provider of goods or services that are necessary to avoid physical harm or mental suffering." An "elder" is defined in the elder abuse statute as "a person who is 65 years of age or older." (§ 368, subd. (g).)

We will focus first on Evidence Code section 1101, subdivision (b) because, as we shall discuss, ultimately the jury was instructed it could use the Levy evidence only in deciding whether Phillips (a) intended to deprive Sheahan of his property, (b) knew he did not have Sheahan's consent to take that property and (c) had a plan or scheme to commit burglary and theft against Sheahan. The jury was instructed, "Do not consider this evidence for any other purpose."

"Evidence of prior criminal acts is admissible 'when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge . . .),' but not to prove the defendant carried out the charged crimes in conformity with a character trait. (Evid. Code, § 1101.) 'To be relevant on the issue of identity, the uncharged crimes must be highly similar to the charged offenses. . . . [¶] . . . [¶] A lesser degree of similarity is required to establish relevance on the issue of common design or plan. . . . [¶] The least degree of similarity is required to establish relevance on the issue of intent. [Citation.] For this purpose, the uncharged crimes need only be "sufficiently similar [to the charged offenses] to support the inference that the defendant

27

' "probably harbored the same intent in each instance." [Citations.]' " '
[Citations.]" (*People v. Lewis* (2001) 25 Cal.4th 610, 636-637.)

" 'The presence of a design or plan to do or not to do a given act has
probative value to show that the act was in fact done or not done.' [Citation.]
For example, a letter written by the defendant stating he planned to commit
a certain offense would be relevant evidence in a subsequent prosecution of
the defendant for committing that offense. [Citation.] The existence of such
a design or plan also may be proved circumstantially by evidence that the
defendant has performed acts having 'such a concurrence of common features
that the various acts are naturally to be explained as caused by a general
plan of which they are individual manifestations.' [Citation.]" (*People v.
Ewoldt* (1994) 7 Cal.4th 380, 393-394 (*Ewoldt*).)

In general, evidence of uncharged crimes is relevant to prove identity,
common design or plan, or intent if the charged and uncharged crimes are
sufficiently similar to support a rational inference of the ultimate fact or facts
for which the evidence is offered. (*Ewoldt, supra,* 7 Cal.4th at pp. 402-403.)
"On appeal, the trial court's determination of this issue, being essentially a
determination of relevance, is reviewed for abuse of discretion." (*People v.
Kipp* (1998) 18 Cal.4th 349, 369.)

Even if evidence of a defendant's prior uncharged offenses is relevant,
it may not be admitted in contravention of " 'other policies limiting
admission, such as those contained in Evidence Code section 352.' " (*Ewoldt,
supra,* 7 Cal.4th at p. 404.) Under the latter section, even if relevant, other
crimes evidence must be excluded if its probative value is " 'substantially
outweighed by the probability that its admission [would] . . . create
substantial danger of undue prejudice, of confusing the issues, or of
misleading the jury.' " (*Id.* at p. 404, citing Evid. Code, § 352.)

" ' "The code speaks in terms of *undue* prejudice. . . . ' "The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, 'prejudicial' is not synonymous with 'damaging.' " [Citation.]' [ Citation.] [¶] The prejudice that section 352 ' "is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." [Citations.] "Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors. [Citation.]" [Citation.]' [Citation.] In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." [Citation.]' [Citation.]" (*People v. Scott* (2011) 52 Cal.4th 452, 490-491.)

As with the issue of relevance, we review under the abuse of discretion standard the trial court's determination whether the undue prejudice outweighs the probative value of the evidence. (See *Ewoldt*, *supra*, 7 Cal.4th at p. 405.)

### B. Relevant Proceedings

Prior to commencement of the trial, the People sought to introduce evidence of prior uncharged misconduct by Phillips, including his alleged theft from his former employer, Trader Joe's, that led to the termination of his employment there; his alleged theft of property from a deceased man named Columbus George shortly before or after his death when Phillips was

a building manager for the Sacramento Street building where George lived; his alleged theft from a man named Ramon Garcia; and his alleged theft of property from a deceased man named Gene Levy, who had lived in the Bush Street building managed by Phillips. The People sought to introduce this evidence under Evidence Code section 1101, subdivision (b) to show Phillips's intent, motive, absence of mistake and common plan or scheme in robbing Sheahan. The People also argued the evidence regarding George and Levy was admissible as propensity evidence under the elder abuse exception provided in Evidence Code section 1109, subdivision (a)(2).

Phillips sought to exclude all evidence of his prior bad acts in a motion in limine.

The trial court requested that the People provide details regarding this evidence. As to Levy, the People explained that Phillips had been an assistant property manager of the building where Levy lived and had access to his apartment. When Levy's family members came to San Francisco to take Levy back to Florida to die, Levy provided them with information about items of value they should come and collect after his death. While there, Levy's family members met Phillips in his capacity as assistant property manager for the building. After Levy died, his family returned to retrieve his belongings and found the apartment had been burglarized. A window had been left open and it looked like a break-in, but it seemed suspicious because Phillips was aware of where Levy kept some items of value. The family members provided information to the police. The items of value Levy had told them about had been stolen, and were later found by police either in Phillips's possession or having been sold to third persons. The court asked whether family members would testify about these events, and the People initially responded that they would.

30

The court initially indicated its intent to allow evidence of the thefts from Levy to show intent and common scheme or plan under Evidence Code section 1101, subdivision (b), observing that Levy's apartment "appear[ed] as if it had been burglarized in very much a similar manner to Mr. Sheahan's abode, so I think again it's up to the jury to decide, one, if they believe this; and two, if they do, it only goes to those two things [intent and common plan or scheme] and nothing else." The court expressed doubt about allowing it in under Evidence Code section 1109 because the items "[were not] taken while Mr. Levy was there. Mr. Levy was gone." We infer the court meant that the requirement of the elder abuse statute that the abuse cause the victim to experience mental or physical suffering could not be established. The court excluded some of the other evidence (the alleged thefts from Columbus George and from Trader Joe's), and the People withdrew their request concerning evidence of the Ramon Garcia theft, with the caveat that the George and Trader Joe's evidence could be used on rebuttal if Phillips testified at trial.

The court held multiple hearings to consider these issues, and ultimately, after holding an Evidence Code section 402 hearing regarding the witness pertaining to George, decided to exclude the evidence of the George incident. It did so because George's daughter, who had been estranged from him, could only speculate that the allegedly stolen property (the $5,000 check of George's that Phillips had cashed after his death, and the valuable items belonging to George that were found in Phillips's possession) was not given by George to Phillips. The court stated it would admit the evidence of the Levy incident. At one point, it stated it was admitting the Levy evidence under both Evidence Code section 1101, subdivision (b) and section 1109. It ruled the Levy evidence could be discussed in the People's opening statement

31

over the defense objection that the People had admitted they were unable to bring Levy's family members to California to testify, accepting the People's argument that there was circumstantial evidence showing Phillips had stolen the paintings and guns belonging to Levy.

During opening statements, the prosecution described the evidence of the manner of Sheahan's death, the video evidence linking Phillips to the murder, the police investigation, the scene of the crime, the evidence of Phillips's relationship with Fuscablo and desire to bring him here from the Philippines, his various efforts to raise money for that purpose, his attempts to withdraw money from Sheahan's account on the day of the murder, his cashing checks not actually made out by Sheahan after Sheahan's death, and his communications with Fuscablo stating he "fought hard all day" to get money to send Fuscablo after spending most of Saturday at Sheahan's apartment.

Then the prosecutor discussed the Levy evidence. He said, "You're going to learn that Mr. Sheahan wasn't the first older person that Mr. Phillips took advantage of, having worked as a resident manager, assistant manager in a building in Nob Hill, . . . Sacramento [Street]. Mr. Phillips worked there for a number of years, where there were some folks in later years, one person is Gene Levy, who had been sick, had gotten cancer as well, and eventually died of cancer. [¶] Fortunately for Mr. Levy, he was able to travel out of state in the last days of his life, be brought by family, his sister and brother-in-law to Florida where he passed; but having established a relationship and a rapport with him, Mr. Phillips seized upon an opportunity to gain access, which he had as a resident manager, to his apartment and take his valuables. He took guns. He took coins and collectables. He took paintings of great value. [¶] He had met some of the family members, and

then reported a burglary. Again, a window open, some circumstantial points that suggest the possibility of a burglary that was random, and all of these items gone, and yet through police work, we found out where they went. We found out who they were sold to, found out who got the money and what he did with it. These are the paintings to the tune of many thousands of dollars, checks made out to Mr. Phillips having sold these items."

Later in the opening statement, describing Discenza's conversation and interview with Phillips, the prosecutor again mentioned Levy, stating, "He denies ever being in possession of items he knew to belong to Mr. Levy as well. And with those lies and the other evidence, you will be presented with proof that not only did he commit this heinous act but that he has a propensity to manipulate or form relationships with people who are older or more vulnerable because of their health."

The trial court instructed the jury on the Levy evidence with a version of CALCRIM No. 375. The instruction stated:

"The People presented evidence that Mr. Phillips committed the offenses of burglary as defined in instruction 1700 and theft by larceny, which is defined in instruction 1800 of Gene Levy that were not charged in this case. You may consider this evidence only if the People have proved by a preponderance of the evidence that Mr. Phillips in fact committed the uncharged offense.

"Proof by a preponderance of the evidence is a different burden than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. If the People have not met this burden, you must disregard this evidence entirely.

33

"If you decide that the defendant committed the uncharged offenses, you may, but are not required to consider this evidence for a limited purpose of deciding the following:

"First, if Mr. Phillips acted with the intent to deprive James Sheahan of his property permanently or to remove it from James Sheahan's possession for so extended a period of time that he would be deprived of a major portion of the value or enjoyment of the property in this case;

"And/or, two, that Mr. Phillips knew that he did not have James Sheahan's consent to take the property when he allegedly acted in this case, and that James Sheahan's property was stolen;

"And/or three, that Mr. Phillips had a plan or scheme to commit burglary and theft by larceny as alleged in this case.

"In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offenses and the charged offenses. Do not consider this evidence for any other purpose. If you conclude that Mr. Phillips committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of Counts 1 through 10, and the People must still prove each charge and allegation beyond a reasonable doubt."

**C. Analysis**

### 1. *The Trial Court Did Not Abuse Its Discretion by Admitting the Levy Evidence Under Evidence Code Section 1101, Subdivision (b).*

The trial court instructed the jury it could consider the Levy evidence to show Phillips intended to deprive Sheahan of his property, knew he lacked Sheahan's consent to take the property and had a plan or scheme to commit burglary or larceny. Phillips complains that the trial court did not initially state the evidence would be admitted for knowledge although it ultimately

34

instructed the jury it could consider it for that purpose. He contends the Levy evidence was not relevant to the issue whether Phillips knew he did not have Sheahan's permission to take his property because "even if appellant knew in 2014 that he did not have Levy's consent to have his property, that knowledge would not have provided appellant with any relevant information regarding the entirely separate question of whether or not he had Sheahan's consent to have his property several years later."

The People contend that knowledge that Sheahan's property was stolen was relevant to prove Count 10, the receiving stolen property charge, for which knowledge that property is stolen is an element. They also argue such knowledge was relevant to negate Phillips's defense that the money he obtained from Sheahan's bank account was a gift. The People point to the evidence that Phillips claimed the paintings he stole from Levy were a gift from the building owner, which the building owner testified was untrue. Phillips also denied having obtained guns from Levy and suggested to police that anything reported stolen was taken by a burglar, though evidence showed Phillips had sold guns that were registered to Levy. The People contend this evidence "was highly probative of [Phillips's] intent, knowledge, and common plan or scheme."

While the People do not spell out how, precisely, the Levy evidence shows knowledge, their point seems to be that Phillips's knowledge that he stole the property from Levy while claiming it was given to him gave lie to his similar claim that the money he obtained from Sheahan's bank accounts was given to him freely by Sheahan. This argument is different from the kind of knowledge argument in cases such as those cited by Phillips, in which a defendant did something a second or third time after presumably having learned from an earlier incident that repeating the same conduct would pose

35

a similar risk or result in a similar outcome.[9]  But that was not the People's argument here.  Rather, it was that Phillips did not act innocently; he took items he claimed had been given to him but knew he lacked consent to take them.  In other words, his intentional theft of the paintings and guns from Levy tended to show that he acted with the same felonious intent in taking money and property from Sheahan.

In *People v. Lisenba* (1939) 14 Cal.2d 403, our Supreme Court held that evidence that the defendant's former wife met an untimely death under circumstances similar to those surrounding the death of the defendant's current wife shortly after the defendant had purchased a life insurance policy covering her life was admissible in the defendant's trial for the murder of his wife for the purpose of collecting the proceeds of insurance policies on her life. (*Id*. at pp. 424-427.)  Both wives had been found having drowned but were determined on further investigation to have been victims of foul play.  (*Id*. at p. 427.)  The evidence was admissible "not to prejudice the defendant by proof of the prior commission of another crime but as tending to establish that the death of the deceased in the present action was not accidental, as it might at first appear, and as claimed by the defendant, but was the result of a general plan or scheme on the defendant's part to insure, marry and murder his

---

[9]  E.g., *People v. Morani* (1925) 196 Cal. 154, 158-159 (evidence that unlicensed physician previously performed procedure on another woman that caused her to miscarry admitted to show defendant knew procedure he performed on victim of illegal abortion would have same effect); *People v. Ghebretensae* (2013) 222 Cal.App.4th 741, 752-754 (evidence of prior uncharged offense in which defendant threw bindles of cocaine base into fountain admitted to show defendant's knowledge of presence of contraband and its illegal character and intent to sell, required elements of charged drug offense), disapproved on other grounds in *People v. Bryant* (2021) 11 Cal.5th 976, 986, fn. 5.

victims in order that he might thereby profit financially." (*Id.* at pp. 427-428.)

Quoting a Michigan case, our high court stated, " ' " ' "it is clear that where a felonious intent is an essential ingredient of the crime charged, and the act done is claimed to have been innocently or accidentally done, or by mistake, or when the result is claimed to have followed an act lawfully done for a legitimate purpose, or where there is room for such an inference, it is proper to characterize the act by proof of other like acts producing the same result as tending to show guilty knowledge, and the intent or purpose with which the particular act was done and to rebut the presumption that might otherwise obtain." ' " ' " (*People v. Lisenba, supra,* at p. 428.) The court quoted a federal case distinguishing the " ' "myriad of cases where evidence of other and collateral transactions has been admitted to prove the *quo animo*, s*cienter*, motive, or intent of the defendant in the doing of a particular act." ' " (*Id.* at p. 428.) It reasoned that many of those authorities " ' "would be inapplicable to the present case, for there the evidence was introduced to show knowledge, while here its purpose is to negative the claim of accident and the alleged innocent motive, injected into the case by the defendant himself. It is sufficient to say that from the earliest times the propriety of admitting evidence for the purpose here stated has been fully recognized." ' " (*Id.* at pp. 428-429) " ' "In each case the question is, and of necessity must be, whether the evidence tendered has probative effect, logically and under the doctrine of chances." ' " (*Id.* at p. 429.)

The rule that evidence of prior acts to negative the claim of accident or innocent motive is sometimes described as "the doctrine of chances." (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1378 (*Spector*).) The idea is that " 'Innocent persons sometimes accidentally become enmeshed in suspicious

circumstances, but it is objectively unlikely that will happen over and over again by random chance.' (Imwinkelried, *An Evidentiary Paradox: Defending the Character Evidence Prohibition by Upholding a Non-Character Theory of Logical Relevance, the Doctrine of Chances* (2006) 40 U.Rich. L.Rev. 419, 423.) 'The doctrine does not ask the jurors to utilize the defendant's propensity as the basis for a prediction of conduct on the alleged occasion. Instead, the doctrine asks the jurors to consider the objective improbability of a coincidence in assessing the plausibility of a defendant's claim that a loss was the product of an accident or that he or she was accidentally enmeshed in suspicious circumstances.' (*Id*. at p. 439.)" (*Spector,* at p. 1379.) " 'This type of evidence is admitted under several of the familiar category labels—absence of mistake or accident, modus operandi, or plan or scheme—but probability based reasoning underlies its relevance.' " (*Ibid*., quoting Cammack, *Using the Doctrine of Chances to Prove Actus Reus in Child Abuse and Acquaintance Rape:* People v. Ewoldt *Reconsidered* (1996) 29 U.C. Davis L.Rev. 355, 386, fn. omitted.) As the court explained in *People v. Jones* (2011) 51 Cal.4th 346 (*Jones*), "the recurrence of a similar result tends to negate an innocent mental state and tends to establish the presence of the normal criminal intent." (*Id*. at p. 371.)

"Like evidence of uncharged offenses admitted to prove intent, evidence of such offenses offered to negate accident or mistake requires the least degree of similarity with the charged offense." (M. Simons, California Evidence Manual (2022 ed.) § 6:17, p. 572, citing *People v. Burnett* (2003) 110 Cal.App.4th 868, 881.) *Burnett*, at pages 879-881, is a good example. There, the defendant was charged with animal cruelty for snatching a dog from a car and throwing it onto a roadway. He claimed he had released the dog accidentally after it bit him, and the court held evidence of an uncharged

incident in which the defendant beat a stray dog to death was properly admitted to negate the claim of accident.

The *Jones* case bears a strong resemblance to the case before us. There, the trial court admitted evidence of a prior robbery committed by a defendant who was charged with first degree murders after stabbing a husband and wife while committing an early morning burglary and robbery. (See *Jones*, *supra,* 51 Cal.4th at pp. 351, 371-372.) To establish intent to steal, the prosecution presented evidence of an incident eight years earlier in which "defendant and a cohort robbed three men of their money at gunpoint" as they were leaving a furniture store where they worked. (*Id*. at pp. 355, 371-372.) Our high court observed that the prior robbery and charged home invasion murder "were not particularly similar, but they contained one crucial point of similarity—the intent to steal from victims whom defendant selected. Evidence that defendant intended to rob the [earlier] victims tended to show that he intended to rob when he participated in the [currently charged] crimes. This made the evidence relevant on that specific issue . . . ." (*Ibid*.)

Here, the resemblance of the Sheahan burglary-murder to the prior Levy burglary is considerably stronger than the similarity of the home-invasion robbery murder to the prior street-side robbery in *Jones*. Both of Phillips's burglaries were from apartments. The victims, Levy and Sheahan, both suffered from terminal cancer, a fact known to Phillips, who had befriended them. Phillips had access to both of their apartments, albeit for different reasons. He had been inside both men's apartments. He took valuable items from the apartments and staged random burglaries by opening windows leading to fire escapes. In both instances, he denied the thefts and claimed what he took had been gifts. He took money or valuables

39

he could readily sell.  He also took items containing each victim's personal identifying information, storing them in his home or storage unit.  The Levy incident, which took place about three years before the Sheahan incident, was sufficiently similar to support the inference that Phillips acted with the same mental state at the time of the Sheahan incident:  the intent to take items of value that belonged to the victim or his family and the knowledge that the takings were without consent.  Stated otherwise, the Levy incident tended to negate Phillips's claim of innocent intent as to Sheahan—his claim that Sheahan had given him the money and property.  Indeed, his claims that the owner of the building he managed gave him Levy's paintings and some other person gave him Levy's guns were shown to be untrue, which tended to prove his similar claim regarding the funds he took from Sheahan was likewise untrue.

These similarities were also sufficient to support an inference that Phillips was engaged in a common scheme of burglarizing the homes of gravely ill people he had befriended, stealing money or items of value from them and attempting to cover up his crimes by staging third-party burglaries. "A greater degree of similarity is required in order to prove the existence of a common design or plan[,]" but the "difference" is one "of degree rather than of kind; for to be similar involves having common features, and to have common features is merely to have a high degree of similarity.'  [Citations.] [¶] To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual." (*Ewoldt*, *supra*, 7 Cal.4th at pp. 402-403.)

That Phillips took Levy's property after Levy's family took him to Florida to die does not undermine these inferences.  Nor do the other

40

differences, which Phillips emphasizes, such as the fact that the burglaries took place in different buildings, that Levy was 58 years old while Sheahan was 75 or that Levy died from his illness whereas Sheahan was murdered.

In short, the trial court did not abuse its discretion in finding the Levy evidence and the evidence regarding Sheahan were sufficiently similar to support an inference that Phillips acted with intent, knowledge that he lacked consent, and according to a common plan and scheme.

We next consider whether the court abused its discretion in determining that the prejudice from the uncharged Levy incident substantially outweighed its relevance. The in limine proceedings reflect that the trial judge was both thorough and careful about admitting other crimes evidence. She repeatedly expressed the need for caution because of the prejudice such evidence can cause. She limited both what evidence she admitted[10] and, through her instruction to the jury, the purposes for which she admitted it.

As we have stated, the "undue prejudice" with which Evidence Code section 352 is concerned flows from evidence that "uniquely tends to evoke an emotional bias against the defendant as an individual and . . . has very little effect on the issues"—evidence "of such nature as to inflame the emotions of

---

[10] As we have discussed, the court excluded evidence of another incident involving a tenant at the Bush Street building (Columbus George) from whom Phillips obtained and cashed a large check and whose guns Phillips had sold. Other items belonging to George were found in Phillips's storage unit. Although the facts were quite similar to those in this case in that Phillips cashed checks on the account of the deceased tenant after he died, the court excluded the evidence for several reasons, including that the evidence about whether George had given the money to Phillips was speculative, and that admitting it would place a burden on Phillips possibly forcing him to testify. The court held the probative value was thus slight and was outweighed by the prejudice.

41

the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction." (*People v. Scott, supra,* 52 Cal.4th at p. 491.) It is " ' "not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." ' " (*Ibid*.) Evidence Code section 352 "requires the exclusion of evidence only when its probative value is *substantially* outweighed by its prejudicial effect. 'Evidence is substantially more prejudicial than probative . . . [only] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome" [citation].' [Citation.] " (*People v. Tran* (2011) 51 Cal.4th 1040, 1047 (*Tran*).)

"[In *Ewoldt*, the court] identified several factors that might serve to increase or decrease the probative value or the prejudicial effect of evidence of uncharged misconduct and thus are relevant to the weighing process required by Evidence Code section 352. [¶] The probative value of the evidence is enhanced if it emanates from a source independent of evidence of the charged offense because the risk that the witness's account was influenced by knowledge of the charged offense is thereby eliminated." (*Tran*, *supra*, 51 Cal.4th at p. 1047.) "On the other hand, the prejudicial effect of the evidence is increased if the uncharged acts did not result in a criminal conviction . . . because the jury might be inclined to punish the defendant for the uncharged acts" and because the absence of a conviction increases the likelihood of confusing the jurors, who will have to determine whether the uncharged acts occurred. (*Ibid*.) "The potential for prejudice is decreased, however, when testimony describing the defendant's uncharged acts is no stronger or more inflammatory than the testimony concerning the charged offense." (*Ibid*.)

Here, the sources from which the Levy evidence emanated were independent of the evidence of the charged offense. Levy's family made a police report of a burglary, which was investigated in 2014 well before the charged offenses. Sergeant Serna—who investigated the Levy burglary, spoke with Phillips and filed the report—did not investigate the charged offenses. There was minimal, if any, risk that the accounts by Levy's family to Serna or the testimony of Serna about his 2014 investigation were influenced by knowledge of the charged offenses. (See *Ewoldt, supra,* 7 Cal.4th at p. 404.)[11]

"On the other side of the scale, the prejudicial effect of [the Levy] evidence is heightened by the circumstance that defendant's uncharged acts did not result in criminal convictions," "increas[ing] the danger that the jury

_____

[11] Additional evidence was developed about the Levy incidents during the investigation of this case, including in Phillips's bank records, which reflected the payments for the sale of guns and paintings; in searches of Phillips's property, which yielded Levy's medications and vehicle registration in Phillips's storage locker; Phillips's statements to Discenza about the guns and paintings and his role as manager at the Sacramento Street building; gun registration information Discenza obtained from a law enforcement data base showing the guns Phillips sold had been registered to Levy. This evidence, coupled with the Serna report, in turn, led to presentation of the testimony of Brooks, Schildhause and Kolander. Brooks testified she did not take or give Phillips any property of tenants who died. Schildhause testified he bought six paintings from Phillips for $7,500. Kolander testified he bought guns from Phillips, who said he owned them. Although the testimony of these witnesses emanated in significant part from Discenza's investigation of this case, nothing about these witnesses' brief testimony was inflammatory, and there was corroborating evidence for their testimony, such as the fact that Phillips had taken other items from Levy (his medications and driver registration), that Kolander had documentation of the purchase, including a copy of Phillips's driver's license, and that Phillips's bank records showed he had received payments totaling $7,500 from Schildhause, the amount Schildhause testified he had paid for the paintings.

might have been inclined to punish [Phillips] for the uncharged offenses, regardless whether it considered him guilty of the charged offenses." (*Ewoldt*, *supra*, 7 Cal.4th at p. 405.) However, that risk was not high in this case because the evidence of the uncharged offenses was relatively anodyne, especially as compared with the evidence of the charged offenses. It was unlikely the jury's passions would be inflamed by the Levy evidence, much less that it would consider convicting Phillips of murder to punish him for stealing paintings and guns from Levy. (See *Tran*, *supra*, 51 Cal.4th at p. 1047 [potential for prejudice is decreased when testimony describing defendant's uncharged acts is no stronger or more inflammatory than testimony about charged offense].)

The evidence was damaging, to be sure, as is the case whenever evidence that a defendant committed an offense on a separate occasion tends to show his intent was to steal from the current victim rather than innocently accept money or property he believed he was lawfully entitled to take. But it was not "unduly prejudicial" in the sense addressed by Evidence Code section 352. The trial court acted well within its discretion in finding the prejudicial effect of the Levy evidence did not substantially outweigh its probative value.

### 2. *Any Error in the Trial Court's Reference to Evidence Code Section 1109 Was Harmless.*

The record is ambiguous, and the parties disagree, as to whether, prior to commencement of the trial, the trial court ruled that the Levy evidence was admissible only for limited purposes under Evidence Code section 1101, subdivision (b), or also admitted the evidence under Evidence Code section 1109, subdivision (a)(2) to show Phillips had a propensity to commit crimes against elders. At one point, the court questioned whether Evidence Code section 1109 applied because the items Phillips took from Levy were not

44

taken while he was present. The court's point, we infer, was that Evidence Code section 1109's definition of "[a]buse of an elder," while including financial abuse, requires conduct that results in "physical harm, pain, or mental suffering." (Evid. Code, § 1109, subd. (d)(1).) Since the alleged theft of Levy's belongings occurred after he had been taken to Florida to be cared for by family and was not discovered until after he died, the People could not have shown Phillips's theft caused Levy any physical or mental suffering. Nothing changed in that respect between the court's comment that Levy had not been present when the theft occurred and its statement four days later that "I have said that [the Levy evidence] can be used by the People for [Evidence Code sections] 1101[, subdivision] (b) and 1109 purposes." Nor does the record reflect that the court had said previously that the Levy evidence could be used for Evidence Code section 1109 purposes. On the other hand, neither attorney questioned nor corrected the court's reference to Evidence Code section 1109 at the time it was made.

What is clear is that the court ultimately instructed the jury it could only consider the evidence to show one or more of the following facts: Phillips intended to deprive Sheahan of his property, Phillips knew he lacked Sheahan's consent to take that property, and Phillips had a plan or scheme to commit burglary and larceny. The instruction further advised the jury, "Do not consider this evidence for any other purpose." The court also instructed the jury, "You must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." And that "Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence." We presume the jury followed the court's instructions.

45

In light of the instruction on the limited purposes for which the jury could consider the Levy evidence, the court's reference to Evidence Code section 1109 in admitting the evidence, whether mistaken or inadvertent, is significant only insofar as it allowed the prosecutor, in opening statement, to assert that the Levy evidence showed Phillips had a propensity to commit burglary and theft.

Contrary to Phillips's contention, the prosecutor's comments about the Levy evidence in his opening statement, which we have set out above, were not propensity arguments. They focused on the commonalities between the Levy and Sheahan incidents: that the victims were "older" and sick with cancer and that Phillips had established a relationship and rapport with them, taken money from one and valuables from the other, met with the victim's family members and, after stealing from the victims, suggested a random burglary had taken place as evidenced by an open window in the apartment. The prosecutor also pointed out that in both cases, Phillips denied being in possession of property belonging to each victim, that these were lies and that the lies together with other evidence would show that "not only did he commit this heinous act but that he has a propensity to manipulate or form relationships with people who are older or more vulnerable because of their health."

Use of the word "propensity" notwithstanding, these were proper modus operandi arguments not improper propensity arguments. They did not point to the Levy evidence as showing Phillips had a criminal propensity generally and thus was inclined to commit crimes such as the ones charged. Rather, the comments described " ' "such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations." ' " (*People v. Sullivan*

(2007) 151 Cal.App.4th 524, 558, quoting *People v. Catlin* (2001) 26 Cal.4th 81, 120.)

As the court stated in *Ewoldt*, "[e]vidence of a common design or plan is admissible to establish that the defendant committed the *act* alleged. . . . For example, in a prosecution for shoplifting in which it was conceded or assumed that the defendant was present at the scene of the alleged theft, evidence that the defendant had committed the uncharged acts of shoplifting in a markedly similar manner to the charged offense might be admitted to demonstrate that he or she took the merchandise in the manner alleged by the prosecution." (*Ewoldt*, *supra,* 7 Cal.4th at p. 394, fn.2.) Such evidence is not admitted to show propensity—that because of his bad character the defendant was " ' "*disposed* to commit such acts." ' " (See *People v. Chhoun* (2021) 11 Cal.5th 1, 570.) Rather, it is admitted as "probative because of its tendency to establish an *intermediary fact* from which the ultimate fact of guilt of a charged crime may be inferred." (*Tran*, *supra,* 51 Cal.4th at p. 1048.)

As in the shoplifting example described in *Ewoldt*, here the evidence showing Phillips was present at Sheahan's apartment on the weekend Sheahan was murdered was irrefutable. The question was what he did while there. The prosecutor's opening statement used the Levy evidence to show that when he entered and exited Sheahan's apartment Phillips *took things of value that belonged to Sheahan* that he could use to obtain money (an ATM card, blank checks, a wallet containing identifying information, a framed print) acting in the same manner he had with Levy in staging the crime as a random burglary to avoid apprehension. The Levy evidence undermined the innocent "gift" scenario painted by Phillips and tended to show that he

47

entered Sheahan's apartment for the purpose of stealing from him and proceeded to do just that.

In short, Phillips's argument that the trial court's mistaken reference to Evidence Code section 1109 as a basis for admitting the Levy evidence resulted in an opening statement leading the jury to believe it could consider that evidence to show propensity is not supported by the record. Nor are we persuaded by Phillips's argument that the trial court's instruction on the limited purposes for which it could consider the evidence was negated by the People's closing arguments, which he again contends were propensity arguments. The prosecutor's closing arguments, like his opening statement, discussed the Levy evidence to suggest a common plan or scheme.[12]

---

[12] Describing the Levy incident, the prosecutor stated, "Mr. Phillips went into his apartment, found what was valuable, and took it and then staged it like a burglary. [¶] Not only did he leave an open window for family members to find, but when the family members suggested to police that they left everything closed up, Mr. Phillips debated, arguing, well, they might not have seen. It was behind a curtain, but I think this is how they came in. *And we find ourselves with the very same circumstances in the staged apartment of Mr. Sheahan.*" (Italics added.) Later, referring to the scene at Sheahan's apartment, he said, "We know that things were out of place from where they had been when Ms. Adina last saw them. And why you've got one window open, and the other with things had been on the windowsill strewn about, why other than to stage it as though someone came in one of those windows? . . . [¶] *And we do have a window that was left in the same way it was in Mr. Levy's apartment, and you are allowed to consider that this is a plan, a scheme that* [*Phillips*] *has engaged in before, and to confuse, to delay, to avoid responsibility.* And then we have even more. [¶] When he thought that might not be enough, we have an additional staging. We have the fact that Mr. Phillips tried to make it look like Mr. Sheahan took his own life."

Drawing another parallel between the two incidents, the prosecutor referred to the fact that Phillips took and sold Levy's guns and paintings for hundreds and thousands of dollars and sold them, and kept Levy's car registration. He argued, "Mr. Phillips was keeping anything and everything he could that might have some value, whether it came in the mail or whether

48

The court's reference to Evidence Code section 1109 in connection with the in limine motions, which appears to have been inadvertent, was in any event harmless error. The evidence was not used for propensity purposes, and the jury was instructed in the limited purposes for which it could properly be considered under Evidence Code section 1101, subdivision (b). Thus, it is not reasonably probable that, absent the court's reference to Evidence Code section 1109, the jury would have returned a verdict more favorable to Phillips.

### 3. *Admission of the Levy Evidence Did Not Deny Him Due Process.*

For the same reasons we have concluded the Levy evidence was properly admitted and that the trial court's ruling that its probative value was not substantially outweighed by its prejudicial effect, we reject Phillips's argument that its admission deprived him of a fair trial. (See *People v. Foster* (2010) 50 Cal.4th 1301, 1335 [admission of evidence relevant to prove a fact of consequence did not violate defendant's due process rights]; *People v. Byers*

---

he could sell it later. [¶] *This was Mr. Phillips' business. That is one of his ventures, one of his endeavors.*" (Italics added.)

In rebuttal, he described another similarity. Observing that Phillips's statements to police that the checks drawn on Sheahan's account were gifts made because of their friendship, he contended, "*And all that work, all that time at the hospital, all the little odd jobs was all working towards a payoff, just like he had tried to get a payoff from every other person he had interacted with, Gene Levy, Mr. Schildhause, et cetera.* It was a payoff. He was putting in that work, either because Mr. Sheahan was going to die when it was pretty dire at the hospital or shortly after, and Mr. Phillips wanted to be around and as close as possible."

The theme of these arguments was that Phillips's acts with respect to Sheahan were the manifestation of a plan or scheme he had engaged in with Levy and others of gaining the trust of older and vulnerable men, taking their money or things of value when they were unable to prevent him from doing so, and then staging the scene to cover up his crimes.

49

(2021) 61 Cal.App.5th 447, 455 [where trial court weighed probative value of evidence against its prejudicial effect, admitted it on relevant issues of motive and intent, and gave limiting jury instructions, its admission did not violate due process or render defendant's trial fundamentally unfair].)

## II.

### *Admission of Sergeant Discenza's Testimony That He Thought the Stains on Phillips's Pants Were Blood Was Not an Abuse of Discretion and Did Not Deprive Phillips of a Fair Trial.*

#### A. The Motion in Limine

Phillips contends that the trial court erred prejudicially and violated his constitutional rights by admitting, and indeed eliciting, Discenza's testimony that he thought stains that the video showed on Phillips's pants as he exited Sheahan's apartment on Saturday August 12, were blood. In the Evidence Code section 402 hearing, Discenza testified that one stain was not present when Phillips first entered the apartment but was visible when he first exited the apartment on that date.

By motion in limine, Phillips sought to exclude any opinion testimony by prosecution witnesses about what the substance on Phillips's pants in the videotape was. The court heard arguments on the motion, concluded that before deciding whether Discenza could testify on the subject she wanted to hear what his testimony would be and conducted an Evidence Code section 402 hearing at which Discenza testified. The court then stated that based on Discenza's 20 years in the police department and four in the homicide detail, and having seen hundreds of scenes where there is blood and taken courses with regard to blood spatter, he was "qualified to state that something in his opinion is consistent with blood; but—I think that that's ultimately a question for the jury to ultimately decide if they agree with

50

Sergeant Discenza or not. [¶] So I will allow him to testify that he believes that this bloodstain or this stain is consistent with a bloodstain and why."

## B. The Trial Testimony

At trial, Discenza testified briefly about his training and work history for the San Francisco Police Department as a patrol officer, a field training officer, a plainclothes, and doing investigations, first handling non-homicide major crimes and then homicides. He testified that he was the lead investigator in this case and detailed steps he took to investigate it. The prosecutor did not seek to have Discenza qualified as an expert on blood or blood stains or any other topic.

Discenza testified that he requested surveillance video from the manager of Sheahan's apartment building, and was provided surveillance footage covering a period from 1:00 p.m. on Friday August 11, 2017, through about 10:00 a.m. on Monday August 14. Clips of that video footage beginning at about 10:21 a.m. on Saturday August 12 were played for the jury. During pauses in the video, the prosecutor asked questions of Discenza who gave responses. He identified Phillips as the person seen in the video. He testified that he saw something on Phillips's pants in the third clip at 11:47 a.m. that he had not seen in the earlier clips showing Phillips entering the building, namely, a stain beneath the knee on Phillips's left pant leg. The prosecutor then asked Discenza whether he had seen blood at hundreds of crime scenes he had investigated and had formed an opinion about what the stain on Phillips's pants might be. Discenza stated that he had formed an opinion based on the facts that there had been a lot of blood in the apartment when Sheahan was found, that when Phillips had entered the building there was no stain on his pants, that when he left the building there was a stain, and

51

that there was information he had learned from Tom Sheahan and from phone records.

Before he could explain further, defense counsel objected on hearsay grounds. The court then suggested that they go into his opinion first and then follow up with further bases for the opinion and asked Discenza, "So did you have an opinion as to what that depicted seeing no stain going in and a stain going out[?]" Discenza responded, "Yes. I thought it was blood." Defense counsel objected that the opinion was "speculation," and the court overruled the objection. The prosecutor then asked, "Based on watching all of the video, in color, size, shape, et cetera, did it appear consistent with blood to you?," to which Discenza responded "Yes."

The prosecutor played three additional clips of the video showing Phillips exiting and entering the same day, and Discenza testified that the stain on Phillips's pants could be seen in them and that an additional stain on the pants appeared just above the knee in the third clip. He testified that he formed an opinion based on his experience and on information he had from this case that the second stain was "more blood transfer from the scene" and appeared consistent with blood. Both stains on the left leg of Phillips's pants could be seen at all of Phillips's subsequent entries and exits from Sheahan's apartment that day, the video clips of which were shown to the jury. The stains were not present on Phillips's pants during his single entrance and exit to and from Sheahan's apartment on Sunday August 13.

### C. Analysis

"Opinion testimony is generally inadmissible at trial. [Citations.] Two exceptions to this rule exist. First, a properly qualified expert, with 'special knowledge, skill, experience, training [or] education' may provide an opinion. (Evid. Code, § 801, subd. (b).) The subject matter of such an opinion is limited to 'a subject that is sufficiently beyond common experience that [it]

52

would assist the trier of fact.'  (*Id.*, subd. (a).)  'Expert opinion is not admissible if it consists of inferences and conclusions which can be drawn as easily and intelligently by the trier of fact as by the witness.  [Citation.]' [Citation.]  '[T]he decisive consideration in determining the admissibility of expert opinion evidence is whether the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness or whether, on the other hand, the matter is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.'  [Citation.]  Thus, the purpose of expert testimony, to provide an opinion beyond common experience, dictates that the witness possess uncommon, specialized knowledge.

"Lay opinion is also admissible, but it plays a very different role than expert opinion and is subject to different rules of admissibility. ' "Lay opinion testimony is admissible where no particular scientific knowledge is required, or as 'a matter of practical necessity when the matters . . . observed are too complex or too subtle to enable [the witness] accurately to convey them to court or jury in any other manner.' [Citations.]" [Citation.]' [Citation.]  It must be rationally based on the witness's perception and helpful to a clear understanding of the witness's testimony. (Evid. Code, § 800; [citations].)  For example, testimony that another person was intoxicated [citation] or angry [citation] or driving a motor vehicle at an excessive speed [citation] conveys information to the jury more conveniently and more accurately than would a detailed recital of the underlying facts. But unlike an expert opinion, the subject matter of lay opinion is 'one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness,' and requires no specialized background. [Citation.]" (*People v. Chapple* (2006) 138 Cal.App.4th 540, 547.)

Discenza's testimony falls within the lay opinion parameters. He testified about the video surveillance footage of Phillips's entries and exits from Sheahan's apartment building and apartment on the Saturday on which Sheahan appears to have been murdered. He explained that he had obtained the surveillance video from the manager of the apartment building where Sheahan lived and had reviewed the entire footage, which covered more than two days. As the lead investigator, he testified about the video and about the other steps he took in the investigation and the evidence he and other officers uncovered.

Phillips argues that the trial court's ruling admitting the testimony was unclear regarding whether it was allowing him to testify about the blood evidence as an expert or as a lay person. His point is well taken. In explaining its ruling, the court referred to Discenza's experience in the police department and the homicide detail and exposure to "hundreds of . . . scenes where there's blood" and followed with, "I think he's *qualified to, as would any type of similar expert,* be qualified to state that something in his opinion is consistent with blood . . . ." (Italics added.) However, at trial, the prosecutor asked about Discenza's experience but did not seek to qualify Discenza as an expert on blood evidence or any similar subject before posing questions about the stains. Defense counsel objected to the prosecutor's questions and to a question from the court as calling for speculation, but the trial court overruled most of them. The court ultimately instructed the jury on lay witness opinion testimony.

Phillips argues that the court's ruling, insofar as it allowed Discenza to testify about this evidence as a lay witness, was error. He cites the general rule that lay witnesses " 'must ordinarily testify to facts, not opinions' " and asserts that " '[o]pinion testimony is generally inadmissible at trial.' " (Citing

54

1 Witkin, Cal. Evidence (3d ed. 1986) § 447, p. 421; 1 Witkin Cal. Evidence (4th ed. 2000) Opinion Evidence, §1, p. 528; and *People v. Torres* (1995) 33 Cal.App.4th 37, 45.) These general principles are accurately stated but do not cover the waterfront on the issue before us.

In Witkin's current evidence treatise, section 1 is headed "Traditional Rule of Exclusion" and contains the caveat, "But the rule has been subjected to much criticism (see infra, § 2), and has undergone so much relaxation in liberal jurisdictions that opinions are now received in a great many situations in which they are necessary or useful. (See infra, § 3 et seq.)" (1 Witkin, Cal. Evidence (5th ed. 2021) Opinion Evidence, §1). As section 2 goes on to explain, the California Evidence Code established a new rule consistent with the original Uniform Rules of Evidence, "loosening" the standard for lay opinion testimony by allowing trial courts discretion to admit it. (1 Witkin, Cal. Evidence (5th ed. 2021) Opinion Evidence, § 2.) Section 4 explains, "The modern tendency of the courts is to relax the 'necessity' test and allow opinions where they are 'helpful' in understanding testimony. This was the approach of the Uniform Rules of Evidence, and it was substantially restated in [Evidence Code section] 800." (*Id.*, § 4.)

Phillips further argues that lay opinion testimony must not address "matters that go beyond common experience." That is a correct statement of the law. (*People v. Chapple*, *supra,* 138 Cal.App.4th at p. 547.) But Phillips's contention that identifying a substance on clothing as blood or possible blood is "beyond common experience" is conclusory, unsupported by either authority or analysis. Besides, the contention makes no practical sense. People often cut themselves and have other accidents or observe others have such accidents and blood frequently ends up on clothing, kitchen towels or other items. The look of a bloodstain on fabric is not beyond common

experience, much less so far beyond that jurors cannot evaluate it without expert testimony.

As one evidence treatise states, "Unfortunately, many violent crimes may require witnesses to testify that substances they saw in connection with the crime was blood. Technically, such substances probably cannot be definitively identified as blood without scientific testing, but courts nevertheless permit lay witnesses to give their opinion that what they observed appeared to be or was blood. This approach is based on the commonsensical conclusion that the ordinary person is exposed to blood in the course of their life experiences and thus is quite capable of giving an opinion that a particular substance was blood." (3 Wharton's Criminal Evidence (15th ed. Nov. 2021 update) § 12:12, fn. omitted.)

While the parties have cited no California case, and we have found no published California case specifically ruling on this issue, we can say with some confidence that the identification of a substance on clothing or fabric as blood is not a matter beyond common experience. (Cf. *People v. Clark* (1993) 5 Cal.4th 950, 1018 [noting in dicta, "it is a matter of common knowledge, readily understood by the jury, that blood will be expelled from the human body if it is hit with sufficient force and that inferences can be drawn from the manner in which the expelled blood lands upon other objects"], disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Phillips also argues that a lay witness's opinion must not go " 'beyond the facts he personally observed' " and must be "helpful to a clear understanding of the witness's testimony." He contends that what "Discenza actually observed on the videotape" "was something he was entirely capable of conveying without the need for an expression of opinion" and that "the

56

jurors were shown the videotape and thus could see and evaluate it on their own without the need for any lay opinion testimony about what it portrayed."

We disagree. First, Discenza's testimony related his perceptions of what he saw on the video surveillance camera, the appearance of the stains, Phillips's entries and exits from the apartment, and the timing of the appearance of the stains. Second, the video contained significant subtleties that Discenza's testimony pointed out. We have reviewed the video surveillance evidence about which Discenza testified. It is possible for a lay person to see the stains on Phillips's pants if she knows when and where to look for them and slows or stops the video footage sufficiently to focus on them. The video footage is in color and the stains are visible, but only with that knowledge. Without Discenza's testimony and the accompanying pauses in the surveillance video, the stains on Phillips's pants as he came down the steps and moved along the hallway on his way from and to Sheahan's apartment would have been too subtle to notice. Discenza's testimony aided the jury (and this court) in reviewing the video clips by pointing out where and when the stains appeared on the video footage.

Discenza theoretically could have pointed out the stains to draw the jury's attention to them without testifying he thought they were blood. But the significance of the stains to the investigation would not have been evident without Discenza's opinion about what the stains were and his explanation of the bases for that opinion. He testified that the clips showing Phillips coming in and out included all of Phillips's entries and exits from the building on the surveillance video for August 12, 2017. Through his testimony coupled with the video footage, he showed that Phillips first entered the apartment without any stains on his pants but left the apartment with them. He did not state that he could tell simply from looking at the stains that they were

57

blood. Rather, he testified that his belief was based on Phillips having entered the apartment without stains and having exited with them and on the large amount of blood and blood spatter observed in Sheahan's apartment. He further testified that the color, size and shape of the stains appeared to him to be consistent with blood. His testimony was helpful to the jury because it identified something subtle, the presence and significance of which likely would not have been seen or understood by jurors watching the videotape without it. Discenza's testimony provided connections between dots, that is, items of evidence, in a way that was helpful to the jury. Similar testimony pointing out the stains without explaining why they were potentially significant would have been confusing, not helpful, to the jury.

Phillips also contends that by eliciting the testimony that "what he saw on appellant's pants in the videotape was blood," the trial court "violat[ed] its own clearly stated ruling . . . that "no witness, could opine that it was blood that was seen on the pants in the videotape." Phillips overstates the trial court's in limine ruling. While the judge made clear that the issue of whether the stains were blood was ultimately one for the jury, she concluded by stating, "So I will allow him to testify that *he believes* that this bloodstain or this stain is consistent with a bloodstain and why." (Italics added.) Discenza did not testify that what he saw on Phillips's pants in the video *was* or *is* blood. His testimony was couched in tentative terms: he "thought" it was blood because, in part, of other evidence (the amount of blood at the scene and the timing of its appearance), and he testified that its size, shape and color "*appeared consistent* with blood." (Italics added.)

Nor did Discenza's opinion testimony usurp the jury's responsibility to make its own determination of the facts, including whether the stains were blood. Indeed, Sergeant Lyn O'Connor, who was qualified as a blood spatter

58

expert, testified that the substance on the pants, as viewed on the videotape, was consistent with blood but was also consistent with any dark liquid.

Further, Discenza made clear that the issue was simply his belief and had not been confirmed by scientific testing. He testified that when he searched Phillips's residence and storage units, he found "a number of pairs" of cargo pants at Phillips's residence but they were clean and one had been bleached. Two pairs of cargo pants were tested for blood and none was found.

Finally, as the People point out, the court instructed the jury with CALCRIM No. 333, which told them, "Witnesses, who were not testifying as experts, gave their opinions during the trial. You may but are not required to accept those opinions as true or correct" and may give them "whatever weight you think appropriate." It directed them to consider "the extent of the witness's opportunity to perceive the matters on which his or her opinion is based, the reasons the witness gave for any opinion, and the facts or information on which the witness relied in forming that opinion" and to "decide whether information on which the witness relied was true and accurate." The jury could "disregard all or any part of an opinion" it found "unbelievable, unreasonable, or unsupported by the evidence." In short, the jurors were permitted to decide for themselves whether they thought the stains on Phillips pants were blood, based on their appearance in the videotape and on all the facts surrounding their appearance on Phillips's pants.

For these reasons, we conclude the trial court did not abuse its discretion by admitting Discenza's testimony that he thought the stains on Phillips's pants were blood. For the same reasons we find no state law error, we also conclude the admission of Discenza's testimony about did not deprive Phillips of a fair trial.

# III.

## *Phillips Fails to Show Error or Prejudice in the Trial Court's Rulings on Objections During Closing Arguments.*

Phillips contends the trial court erred by sustaining objections to two lines of defense counsel's closing argument and by overruling an objection defense counsel made to a related part of the prosecutor's closing argument. Specifically, pointing to the evidence that Phillips took a framed picture from Sheahan's apartment, defense counsel argued, "When Sergeant Discenza who is here in court right now took the stand, he sat right here, and I asked Sergeant Discenza where is that picture?  He said, it's downstairs in evidence."  After the trial court sustained the prosecutor's objection, defense counsel persisted, "I asked Sergeant Discenza to bring that picture to court this afternoon." . . .  "Have you seen that picture?" . . .  "Have they brought that picture into evidence?"  The prosecutor continued to object and the trial court sustained the objections.  In regard to a second item of evidence, defense counsel argued that he had asked the blood spatter expert, O'Connor, to bring to court the bloody tissue or similar material that had been found at the crime scene.  "So I asked [O'Connor] to bring that to court.  I'm still waiting."  The court sustained the prosecutor's objection to this question and instructed the jury to disregard it.

Phillips contends the trial court's ruling was error because "[i]t is proper in closing argument for 'the defense . . . to make arguments to the jury based on the failure of the opposing party to present evidence.' "  The cases he cites support that general proposition.  (*People v. Alaniz* (2017) 16 Cal.App.5th 1, 6 ["It is firmly established that in general both the defense and, in appropriate circumstances, the prosecution may make arguments to the jury based on the failure of the opposing party to present evidence"]; *People v. Szeto* (1981) 29 Cal.3d 20, 34 [prosecutor's reference to defendant's

failure to produce alibi witnesses for crucial period permissible as comment on state of evidence or on failure of defense to introduce material evidence].) Phillips is also correct in stating that counsel is afforded significant leeway in closing argument. (*People v. Centeno* (2014) 60 Cal.4th 659, 666.)

Defense counsel's arguments, however, went beyond a fair comment on the absence of material evidence. Defense counsel's arguments were not simply that the prosecution did not present certain evidence at trial and that the jury could therefore infer something from the absence of that evidence. The arguments to which the court sustained objections implied that if a defense attorney asks a witness during a trial to produce specified evidence and the witness fails to do so, the witness is not credible or the prosecution is improperly withholding material evidence. The argument could have misled the jury if not corrected. Jurors are not necessarily familiar with the discovery process. Nor are they likely to know a defendant has the power to subpoena evidence. Jurors unschooled in these matters might have taken defense counsel's arguments to mean the prosecution wrongly withheld and was hiding material evidence.

Defense could have avoided the problem (and was invited by the trial court to phrase the arguments differently) by simply asserting—without reference to the requests it had made at trial to the prosecution's witnesses— that the prosecution did not test the framed print for blood or offer it into evidence and that the photographs of the print were inadequate. The same is true for the tissue or other material defense counsel claimed should have been produced at trial once he requested it.[13] As framed, the defense

---

[13] Some of the trial court's comments can be construed as ruling that defense counsel's arguments conflicted with the jury instruction providing that neither side has to produce all evidence, which the appellate courts have rejected. However, they can also be read simply to accept the prosecutor's

arguments were misleading and the trial court did not err in sustaining the objections.

Even if there had been any error, moreover, it was harmless. Phillips contends his theories at trial were that he left Sheahan uninjured on Sunday and the framed print he took was a gift, and that the police failed to investigate adequately and if they had scrutinized the evidence and collected more evidence, they might have found the real perpetrator. But nothing prevented defense counsel from making these arguments. He was able to and did argue his theory of Phillips's innocence in his closing. Specifically, he argued that Phillips was "a very good friend" of Sheahan and that Sheahan gave Phillips his old journals and the framed picture. He quoted from Sheahan's statements about their friendship in his journals and pointed to the evidence that Sheahan was researching how to hang another picture in place of the one he gave Phillips.

In his closing, defense counsel also argued various evidence was absent, which he contended showed Phillips could not have been the killer. He argued that Phillips could not have been the perpetrator because there was no evidence of Sheahan's blood or DNA on the framed print, on the carpet in the hallway and stairs of Sheahan's building, or on other items at Phillips's house and storage units or in his car. He argued that there was no evidence of *Phillips's* DNA on anything in Sheahan's house, either. He argued that the police did not investigate certain things or scrutinize the evidence they did

---

argument that counsel was in essence suggesting witnesses who do not comply with a request by a defendant at trial for evidence that could have been obtained in discovery or by subpoena are not credible. In any event, we don't review the stated basis for the ruling but decide if it is correct on any ground.

find.  Finally, as Phillips concedes, his counsel made many of these same points during cross-examination of Discenza and other officers.

Phillips also contends it was error for the court not to sustain his objection to the prosecutor's statements in closing argument that the People were " 'not required to call all witnesses, or present all evidence' " and that, " '[Defense counsel] was suggesting there [sic] not only that the credibility of the witnesses is in question because he gave them a request or command that they didn't comply, but that there's something being hidden from you, because we didn't bring these things to court.  There is a process.  The process is not in front of you when questioning a witness, use that for discovery purposes to say, hey, can you bring this to court.  The judge will decide when and if something is ordered to come to court.  [Defense counsel] has the subpoena power.  He knows that.' "  Defense counsel objected that this argument improperly shifted the burden of proof to the defense.  The trial court overruled the objection.  Phillips claims this "compounded the trial court's erroneous rulings" sustaining the prosecutor's objections to the statements in his closing argument that we have already discussed.

We are not persuaded.  As we have already concluded, defense counsel's closing argument went beyond arguing the absence of evidence by suggesting he could simply demand that a witness produce evidence while questioning the witness at trial and, if the prosecution did not comply, the jury could infer the witness was biased or the prosecution was hiding the ball.  It was to this aspect of defense counsel's argument that the prosecutor was responding to in the arguments quoted above.  It is appropriate for a defense attorney to argue the prosecution is withholding material evidence if the evidence exists, the defense requested it the during the discovery process and it was not provided or presented at trial.  That is not the same as implying a witness has an

63

obligation to produce an item the defense did not subpoena and did not even request until the middle of trial.

In short, the trial court did not err in overruling the defense objection to this responsive argument by the prosecution. This ruling did not occur until the prosecutor's rebuttal and did not prevent the defense from arguing that the People's failures to investigate or to present certain evidence raised reasonable doubt on essential elements of their case. Nor, contrary to Phillips's argument on appeal, did it "serve[] as an implicit endorsement of the notion that the prosecution did not have the burden of proof."

## IV.

### *The Trial Court's Denial of Phillips's Mistrial and New Trial Motions Was Not an Abuse of Discretion.*

Phillips next argues the trial court erred in denying his motion for mistrial and subsequent motion for new trial based on witnesses relating hearsay the court had excluded in ruling on motions in limine. Specifically, the trial court granted defense counsel's motion to exclude hearsay statements that Sheahan's brother, Tom, made to the building manager, Vicki Chak, that he was concerned about Sheahan because he had not heard from him in three days.

The court reasoned, "Sounds to me like time of death is at issue." It directed the prosecutor to "instruct [Chak] or anyone else to just say there was an inability to contact or reach [James] Sheahan versus a specific time period."

The trial court also granted a motion made by the prosecutor, ordering both counsel to "advise all your witnesses of all the Court's rulings." In so ruling, the court admonished counsel, "I have had situations where you pick and choose what you think is going to apply to that witness, which is fine, except for I've had situations where the witnesses said something the

64

attorney didn't even anticipate they were going to say, which violates an in limine. So best to advise them of all my in liminis [*sic*] so they're very clear about the parameters of what they can talk about."

The prosecutor failed to adhere fully to the court's in limine rulings. The prosecutor advised Chak, the apartment manager, about the ruling excluding testimony about Tom having said he had been unable to reach Sheahan for any specific time period, and she testified only that she received a phone call from him indicating he had been unable to reach his brother and asking her to knock on Sheahan's door. However, the prosecutor asked Officer Larkey what steps she and the other first responder had taken once they arrived at Sheahan's apartment building on Monday August 14, 2017, and Larkey responded that they had met with Chak, and that Chak had informed them Sheahan's brother, who lived out of state, was concerned because "he hadn't been able to reach [Sheahan] in about three days." The prosecutor immediately moved to strike the answer as hearsay, and the trial court granted the motion, stating "The last part about the brother will be stricken and cannot be considered." Later, after Phillips moved for a mistrial, the prosecutor told the court he had informed *Chak* about the in limine ruling regarding Tom Sheahan but had not advised Larkey about it because the court's ruling had pertained to Chak and he had not been aware that the officer knew about Tom Sheahan's statement to Chak.

The prosecutor violated the court's ruling on the Tom Sheahan statement, which was not limited to Chak, but expressly covered her "*or anyone else*." (Italics added.) Further, he violated the order the court gave, at his own request, requiring counsel to advise all witnesses about all in limine rulings. Trial judges give admonitions like the one Judge Giorgi gave in this case for good reasons, and the prosecutor's failure to advise all

65

witnesses of all in limine orders rather than to assume witnesses are not aware of the excluded information was negligent.

The same is true of the prosecutor's failure to advise Dr. Moffat, the medical examiner, of the in limine ruling about Tom's statements, and it had a similar result. Asked by the prosecutor how and under what circumstances Sheahan's body came to her, Dr. Moffat responded, "Our investigators were called to his apartment. He had not—his brother hadn't been able to get a hold of him for a couple of days." Defense counsel promptly objected, and the trial court stated it was striking the "last part."

The prosecutor's failure to comply with respect to the medical examiner was inexcusable. The danger the court had warned counsel about had occurred once already with respect to Officer Larkey during the trial. In addressing the defense motion for mistrial regarding Officer Larkey, the court repeated its warning: "I go back to this is why it's critical to tell all witnesses whether you know what they know or not, all of them, of every single motion in limine ruling, because they may know something you don't know they know that may affect a motion." The prosecutor's apparent failure to comply with the court's in limine order a second time is inexplicable. Law enforcement witnesses logically must be assumed to communicate with potential witnesses they encounter during an investigation and to communicate with each other about what they learn during an investigation.

Although the prosecutor clearly erred, prosecutorial error does not require a trial court to declare a mistrial in all circumstances. Only if "a particular incident is incurably prejudicial" should the court grant a mistrial." (*People v. Ledesma* (2006) 39 Cal.4th 641, 683.) That determination " 'is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions' ." (*Ibid.*)

66

We review the trial court's denial of a mistrial motion for abuse of discretion. (See *People v. Schultz* (2020) 10 Cal.5th 623, 673.)

In this case, the court immediately instructed the jury in both instances that the hearsay statements were stricken. The court also instructed the jury, "If I ordered testimony stricken from the record you must disregard it and must not consider that testimony for any purpose." "We presume that a jury follows the court's admonishments." (*People v. Schultz*, *supra*, 10 Cal.5th at p. 673.)

The trial court denied the mistrial motion based in part on the fact that the court struck Larkey's testimony from the record and in part on the prosecutor's representation that he would proffer other evidence showing Tom did not talk to Sheahan for three days.

The prosecutor did in fact offer the evidence about Tom not being able to reach his brother. Sherry Sheahan, Tom's wife,[14] testified that Tom phoned Sheahan every few days, that she did not see Tom call Sheahan or hear him talk with Sheahan on the Saturday of the weekend before she learned of his death, that she saw Tom call James on Sunday August 13, 2017 "[a]bout, half a dozen times," but didn't hear Tom talk with him that day. She did not hear Tom leave a voicemail for Sheahan on Sunday.

The prosecutor also introduced into evidence Sheahan's phone records from August 11 through August 17, 2017, which indicated Sheahan answered no incoming calls after 10:28:26 a.m. on Saturday August 12.

The significance of the hearsay evidence, according to Phillips, and the prejudice flowing from it, stem from the issue of when Sheahan died. As we have discussed, Phillips sought to convince the jury that Sheahan was killed

---

[14] Tom was unavailable to testify because he was undergoing medical treatment for a serious illness.

sometime after Phillips last visited the apartment on Sunday August 13, whereas the People's theory was that Phillips attacked Sheahan on Saturday morning, and that he either died immediately or sometime later but well before he was found on Monday morning. However, the excluded hearsay was far less important than Phillips suggests. As even he concedes, "there was other circumstantial evidence from which the prosecutor could argue its theory that Sheahan was killed on the morning of Saturday [August] 12." Indeed, there was.

Besides the testimony of Sherry Sheahan and Sheahan's telephone record we have just described, the evidence that most strongly placed the assault on the morning of Saturday August 12, 2017, was the surveillance video footage showing Phillips entering Sheahan's apartment that morning, emerging with an apparent reddish brown stain on his pants, and continuing to come and go throughout that day during which the first stain remained and a second stain appeared on his pants. The evidence that Sheahan's blood was found inside the red and black Trader Joe's bag that Phillips carried into and out of Sheahan's apartment that day is further circumstantial evidence that he attacked Sheahan that day.

We therefore disagree with Phillips's assertion that the hearsay evidence that Sheahan's brother Tom said he had been unable to contact him for "about three days" or "a couple of days" was so "powerful" that it was incurable by the judge's orders striking it, coupled with its instruction to the jury that stricken evidence could not be considered. We also agree with the trial court that prosecutor's proffer of other evidence that was admissible on the same subject (which he did in fact provide) rendered the prosecutor's error non-prejudicial in any event. In short, the trial court's denials of the

mistrial motion and the subsequent new trial motion were not arbitrary, capricious or otherwise an abuse of discretion.

## DISPOSITION

The judgment is affirmed.

_____

STEWART, Acting P.J.

We concur.


_____

MILLER, J.


_____

MAYFIELD, J.*


*People v. Phillips* (A156387)

\* Judge of the Mendocino County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

70

Trial Court:San Francisco County Superior Court

Trial Judge:        Hon. Loretta M. Giorgi

Counsel:

Victor Blumenkrantz, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Catherine A. Rivlin, Allen R. Crown, Deputy Attorneys General, for Plaintiff and Respondent.